JAMIEL AND ELIZABETH CHAGRA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chagra v. Commissioner
Docket No. 17826-85
United States Tax Court
T.C. Memo 1991-366; 1991 Tax Ct. Memo LEXIS 415; 62 T.C.M. (CCH) 347; T.C.M. (RIA) 91366; August 6, 1991, Filed *415 Decision will be entered under Rule 155. Ps were involved in drug and gambling activities during some of the years 1977 through 1981. Ps expended large sums of money during 1977, 1978, 1980, and 1981. During 1980, P, Jamiel Chagra, gambled extensively in Las Vegas winning and losing large sums of money. Both Ps were ultimately incarcerated upon their conviction for various felonies. (Jamiel Chagra was convicted of various drug related crimes and Elizabeth Chagra was convicted of conspiracy to obstruct justice and conspiracy to murder a Federal Judge.) Ps failed to report all their income from gambling and drug activities for some of the years in issue. Ps also failed to keep records of their income-producing activities for some of the years in issue. R reconstructed Ps' income by use of the source and expenditure of funds method for 1977, 1978, 1980 and 1981. R utilized the specific item method for 1979, relying on a newspaper article referring to P's gambling activities. R also determined that the underpayment of tax for the taxable years in issue was due to fraud under sec. 6653(b), I.R.C.
Held: 1. Ps' income redetermined for the taxable years 1977, 1978, 1980, *416 and 1981. 2. R's determination for 1979 was arbitrary and capricious and R failed to satisfy his burden of going forward with the evidence as to the existence of unreported income. 3. The underpayment of tax for the taxable years 1977, 1978, and 1980 was due to fraud within the meaning of sec. 6653(b), I.R.C.
4. Respondent failed to prove that the underpayment of tax for 1979 was due to fraud. 5. Respondent failed to prove that the underpayment of tax for 1981 was due to fraud. 6. R's determination as to disallowed deductions for 1978 through 1981 are sustained. Towner Leeper and John Leeper, for the petitioners. Phillip A. Pillar, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Peter J. Panuthos pursuant to section 7443A(b) and Rules 180, 181, and 183. [1] The Court agrees with and adopts his opinion, which is set forth below. *417 OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: Respondent, in his notice of deficiency mailed on March 14, 1985, determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Year
Deficiency
Sec. 6653(b) Addition to Tax
1977
$ 6,724    $ 3,362 1978
828,080
414,040 1979
1,267,118
663,559 1980
527,106
263,553 1981
8,983
4,492   In his amendment to answer, respondent claimed additional deficiencies and additions to tax as follows: Year
Deficiency
Sec. 6653(b) Addition to Tax
1977
$ 531,504 $ 265,752
1978
955,014 477,507  1980
85,120 42,560   The issues for decision are: (1) Whether petitioners are liable for deficiencies in Federal income tax for their taxable years 1977 through 1981 due to their failure to report income from drug dealing and/or gambling; (2) whether petitioners are liable for additions to tax under section 6653(b) for their taxable years 1977 through 1981; (3) whether petitioners are entitled to deductions for attorney's fees in the taxable years 1978, 1979, 1980, and 1981, and cost of goods sold in the taxable year 1979; and (4) whether *418 the statute of limitations bars the assessment and collection of the deficiencies for the taxable years 1977 and 1978. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact filed by the parties are incorporated herein by this reference. Chagra resided at the Federal Correctional Institute at Otisville, New York, at the time the petition was filed in this case. Mrs. Chagra resided at the Federal Correctional Institute at Alderson, West Virginia, at the time the petition was filed. Petitioners Jamiel "Jimmy" Chagra (sometimes hereinafter referred to as Chagra or petitioner) and Elizabeth Chagra (Mrs. Chagra) were formally married in Florida on January 9, 1978. However, they lived together in El Paso, Texas, from April 1974, to January 1978. Patricia de la Torres is Chagra's sister. Joseph Chagra and Lee Chagra are petitioner's brothers. During the *419 years at issue, Joseph Chagra and Lee Chagra were lawyers practicing in El Paso, Texas. Lee Chagra was murdered in his law offices on December 23, 1978. Petitioner was indicted for drug smuggling and drug importation charges on February 29, 1979, and convicted on August 15, 1979 (the "Chagra drug trial"). He was sentenced in 1980 to 30 years' imprisonment without parole. On March 18, 1983, Mrs. Chagra was sentenced to 5 years imprisonment for conspiracy to obstruct justice, and 30 years for conspiracy to murder a Federal judge. Joseph Chagra pled guilty to conspiracy to murder a Federal judge. As part of his plea bargain agreement, Joseph Chagra received a 10-year sentence, which he has served. The deficiencies and additions to tax at issue in this case result from respondent's determination that petitioners failed to report the profits they received from drug trafficking and gambling during the years in issue, and from respondent's disallowance of certain deductions claimed by petitioners. Respondent reconstructed petitioners' income for taxable years 1977, 1978, 1980, and 1981 using the source and expenditure of funds method. For their taxable year 1979, petitioners' income *420 was reconstructed using the specific item method. 1. 1977
Respondent's source and expenditure of funds computation as set forth in the notice of deficiency and as supplemented in his amendment to answer is summarized as follows: Per Notice of
Per Amendment
Deficiency
to Answer
Sources of Funds
Adjusted gross income per return  $ 90,000   $ 90,000  Other nontaxable sources of funds  -0-  -0- Total Sources of Funds
$ 90,000   $ 90,000  Expenditure of Funds
Jewelry - Fort Lauderdale, Florida  $ 107,500  $ 107,500 Jack Eisenberg - American Finance  10,000  10,000 Attorney - Bogota, Colombia  -0-  10,000 Living expenses - Bogota, Colombia  -0-  5,000 Capital Acquisitions rental  -0-  9,000 1,000 lbs marijuana - Gary Fournier  -0-  150,000 Cash to Wallace in Colombia 11/77  -0-  5,000 Cash to Wallace in Florida 11/77  -0-  10,000 Cash to Wallace to Barros - Marijuana  -0-  80,000 Cash to Barros-Wife-Marijuana  -0-  20,000 Connell/Taylor 1 Kilogram of Cocaine  -0-  70,000 Cash to Raul Royce in Colombia - Cocaine  -0-  40,000 Cash to Myers  -0-  12,000 Balance of $ 1,000,000 to Raul Royce  -0-  353,000 Total Expenditure of Funds
$ 117,500  * $ 881,500 Understatement of Income
$ 27,500    ** $ 791,500 *421 a. Expenditures Relating to Illegal Drug Activity
During 1977, petitioner was involved with others in the importation and sale of cocaine and marijuana. Mrs. Chagra was aware of petitioner's activities in this regard. In the summer of 1977, petitioner met with Henry Wallace (Wallace) to discuss marijuana smuggled into the United States from Mexico in which petitioner had an interest. Petitioner informed Wallace that he expected to receive approximately $ 150,000 in proceeds from the shipment. About 6 weeks later, Wallace delivered approximately 6 ounces of cocaine to petitioner in partial payment of the proceeds of the marijuana *422 shipment. Wallace and petitioner met several times thereafter to discuss importing marijuana and cocaine into the United States. Also during the summer of 1977, petitioner was arrested and imprisoned for approximately 3 weeks in Colombia. In June 1977, petitioner paid $ 10,000 to his lawyer in Santa Marta, Colombia. Petitioner also expended $ 5,000 for personal living expenses while in Colombia. In November 1977, petitioner flew to Colombia, where he received 6 kilograms of cocaine from Wallace. Petitioner gave Wallace $ 5,000. Wallace and petitioner discussed using the proceeds of the sale of cocaine to finance the importation of marijuana in boats from Colombia to the United States. Petitioner and Wallace entered into a deal with Jose Barros wherein Wallace would pay $ 100,000 as partial payment for 30,000 pounds of marijuana. Shortly thereafter, petitioner sent $ 80,000 to Wallace in Colombia in partial payment for the marijuana to be smuggled into the United States on a boat called the Dona Petra. Another $ 20,000 was paid by petitioner to Barros' wife. In December 1977, petitioner paid Raul Royce, who had travelled to the United States from Colombia, $ 40,000 in partial *423 payment for the 6 kilograms of cocaine previously furnished to petitioner. In that same month, petitioner and Wallace were in Florida where petitioner paid Wallace $ 10,000. About the time the Dona Petra was ready to be unloaded, petitioner was unloading marijuana from other boats in the Caribbean. Some of the boats, including the Dona Petra, were seized by the Drug Enforcement Agency (DEA) while still loaded with marijuana. b. Other Expenditures
In the latter part of 1977, petitioner purchased two items of jewelry, a platinum ring with several diamonds, and a ladies' Rolex watch set with diamonds. Petitioner paid approximately $ 30,000 for the ring and $ 1,000 for the watch. c. The 1977 Return And Other Tax Matters
Petitioner filed his Federal income tax return for 1977 on August 18, 1978. Petitioner claimed the status of "married filing separately." A Form 1040X for 1977 was submitted on March 26, 1982, on which a net operating loss carryback was reported. The Form 1040X sought a refund in the amount of $ 33,405. It reflects a filing status of "married filing jointly" and is purportedly signed by Elizabeth Chagra. The Internal Revenue Service (IRS) did not *424 process the amended return. Mrs. Chagra did not otherwise submit an income tax return for 1977, and the parties agree that she was not engaged in any income-producing activities in 1977. Petitioner's 1977 return was prepared for him by accountant Lee Heiler. The amount of adjusted gross income reported on the return was orally communicated to Heiler, who was supplied no documentation with which to calculate gross income, deductions, adjusted gross income, or taxable income. On the 1977 return, petitioner reported $ 90,000 of adjusted gross income. He refused to disclose on the return any information concerning the computation of his adjusted gross income, claiming the privilege against self-incrimination under the Fifth Amendment to the United States Constitution. During 1977, some of petitioners' property was seized by the United States Government for taxes due from earlier years. This property included a home located in El Paso, Texas, other real property located in Texas, and miscellaneous personal effects. These items were sold and the proceeds were applied to taxes due. 2. 1978
Respondent used the source and expenditure of funds method to recompute petitioners' *425 income for 1978. Respondent's calculations as reflected in his notice of deficiency, amendment to answer, and alternate computations attached to his reply brief are as follows: Per Notice of
Per Amendment
Deficiency
to Answer
Sources of Funds:
AGI per return  $ 1,376,292  $ 1,376,292  Mortgage payable - Las Vegas, NV  101,619  101,619  Mortgage payable - Las Vegas, NV  68,381  68,381  Other nontaxable sources of funds  -0-  83,000  TOTAL SOURCES OF FUNDS
$ 1,546,292  $ 1,629,292  Expenditure of Funds:
Attorney fees - Form 1040X Amended  $ 100,000    $ 100,000    Lee Chagra - Caesar's markers  500,000  -0-  Harbor Towers - Boston, MA  1,860  1,860  Vivian Chagra - child support  12,000  12,000  Henry Wallace  100,000  100,000  IRS payments - tax year 1977  50,117  50,117  IRS payments - tax year 1976  6,080  6,080  IRS payments - tax year 1975  80,061  80,061  FICA W-1 per return  1,071  1,071  Withholding W-2 per return  20,772  20,772  Capital Acquisition Inc.- capital stock  500  500  Capital Acquisition Inc.- paid in capital  566,246  566,246  1979 Sleekcraft  19,660  19,660  1978 Mercedes Benz  42,820  42,820  Doniphan property - El Paso, TX  67,788  67,788  Residence - Las Vegas, NV  975,000  975,000  Ambrosio Contractor  63,000  63,000  Cash to Raul Royce  -0-  130,000  400 lbs. marijuana  -0-  60,000  Cash to Barros  -0-  50,000  Cash to Mahias  -0-  50,000  Cash to Wallace  -0-  100,000  Cash to Patsy de la Torres/J. Chagra  -0-  40,000  3 kilograms to Wallace  -0-  90,000  3 kilograms to Wallace  -0-  10,000  Cash to Wallace via Quitoni  -0-  45,000  Gambling debt - Footlocker  -0-  915,000  Caesar's Palace currency credit  -0-  480,000  Kerr hit  -0-  85,000  Cocaine to Young  -0-  6,000  Lear jet rental  -0-  7,800  Lear jet rental  -0-  6,300  TOTAL EXPENDITURE OF FUNDS
$ 2,606,975  $ 4,182,075  UNDERSTATEMENT OF INCOME
$ 1,060,683  $ 2,552,783  *426 Per First Alt.
Second Alt.
Computation
Computation
Sources of Funds:
AGI per return  $ 1,376,292   $ 1,376,292 Mortgage payable - Las Vegas, NV  101,619   101,619 Mortgage payable - Las Vegas, NV  68,381   68,381 Other nontaxable sources of funds  -0-   -0- TOTAL SOURCES OF FUNDS
$ 1,546,292   $ 1,546,292 Expenditure of Funds:
Attorney fees - Form 1040X Amended  $ 100,000     $ 100,000   Lee Chagra - Caesar's markers  -0-   -0- Harbor Towers - Boston, MA  1,860   1,860 Vivian Chagra - child support  12,000   12,000 Henry Wallace  100,000   100,000 IRS payments - tax year 1977  50,117   50,117 IRS payments - tax year 1976  6,080   6,080 IRS payments - tax year 1975  80,061   80,061 FICA W-1 per return  1,071   1,071 Withholding W-2 per return  20,772   20,772 Capital Acquisition Inc.- capital stock  500   500 Capital Acquisition Inc.- paid in capital  566,246   566,246 1979 Sleekcraft  13,353   13,353 1978 Mercedes Benz  42,820   42,820 Doniphan property - El Paso, TX  67,788   67,788 Residence - Las Vegas, NV  518,780   336,165 Ambrosio Contractor  63,000   63,000 Cash to Raul Royce  130,000   130,000 400 lbs. marijuana  60,000   60,000 Cash to Barros  50,000   50,000 Cash to Mahias  50,000   50,000 Cash to Wallace  -0-   -0- Cash to Patsy de la Torres/J. Chagra  40,000   40,000 3 kilograms to Wallace  90,000   90,000 3 kilograms to Wallace  -0-   -0- Cash to Wallace via Quitoni  45,000   45,000 Gambling debt - Footlocker  915,000   915,000 Caesar's Palace currency credit  480,000   480,000 Kerr hit  75,000   75,000 Cocaine to Young  -0-   -0- Lear jet rental  7,800   7,800 Lear jet rental  6,300   6,300 TOTAL EXPENDITURE OF FUNDS
$ 3,593,548   $ 3,410,933 UNDERSTATEMENT OF INCOME
$ 2,047,256   $ 1,864,641 *427 At the beginning of 1978, petitioners lived in Florida. For a portion of the year, they rented a house in Pompano Beach. The Pompano Beach house was rented from Capital Acquisitions, Inc. (Capital), for a monthly rent of $ 2,600, as reflected in a lease executed by petitioners. a. Expenses Relating to the Las Vegas House
Sometime prior to October 1978, petitioners decided to move from Florida to Las Vegas, Nevada. On October 2, 1978, petitioner entered into a contract for the purchase of a house located on Viking Drive in Las Vegas. Petitioner paid $ 75,000 of the $ 245,000 purchase price in cash. He gave a mortgage note in the amount of $ 170,000 for the balance. The title to the house was to be issued in the name of Elizabeth N. Chagra. George and Gloria Stroup worked for petitioners when petitioners lived in Florida. Mr. Stroup was a caretaker performing odd jobs for petitioners, while Mrs. Stroup was a secretary for Capital. In the course of her duties as secretary for Capital, Mrs. Stroup handled the corporation's checkbook and payroll. On one occasion, she was requested to make a large cash deposit for petitioners. She made this deposit of approximately $ *428 65,000, which she was told to report as gambling winnings. When petitioners decided to move to Las Vegas, they asked the Stroups to accompany them. The Stroups arrived in Las Vegas after petitioners, in October 1978. Petitioners intended to renovate the property on Viking Drive before moving into it. The Stroups assisted petitioners by selecting contractors to make these improvements and by coordinating matters for petitioners. Mrs. Stroup kept records of expenses, which she left in the Las Vegas house when she returned to Florida, and paid the contractors with cash she received from Mrs. Chagra on request. On one or two occasions, Mrs. Chagra gave Mrs. Stroup substantially more cash than was necessary to pay the presented bill. In such event, Mrs. Stroup retained the excess to pay later bills. Petitioners resided at Caesar's Palace while renovations on their new home were made. Petitioners moved into the house in late January 1979, although an addition to the home was not completed until after June 1979. The Stroups lived in the home until after a new security system was installed in October 1978. After that time, they resided in a nearby rental apartment. The original *429 house on Viking Drive had four bedrooms and six bathrooms. The house was painted in October 1978 and substantial interior and exterior improvements were made. One renovation included the addition of a master bedroom above a six-car garage. The master bedroom was 66 feet by 33 feet and included dressing rooms, a steam room, and a four-seasons room. Substantial landscaping was also done. Expenditures for bringing natural gas and running water to the home and for fencing the property, totaling approximately $ 15,000, were paid in 1978. During the period October 1978 thorough June 1979, petitioners expended in excess of $ 300,000 for improvements to their home on Viking Drive. Records of the general contractor, Harold Hall, as of December 1978 reflected payment by petitioners in the amount of $ 76,165. b. Capital Acquisitions, Inc.
Capital, a Florida corporation, owned the Pompano Beach house in which petitioners resided during a portion of 1978. Capital was formed in 1978 by a Florida attorney who was working with Lee Chagra. Capital was wholly owned by Resall Inc. N.V., a Netherland Antilles corporation. Resall Inc. was allegedly owned by Eduardo Reynosa, a person whom *430 the attorney never met. Chagra never met Reynosa, nor did the corporation's accountant, Howard Amdur. Following the incorporation of Capital, Reynosa's name was not mentioned again. All capital contributions to Capital, which totaled $ 566,756, were made during 1978. Capital purchased two properties in 1978, one of which was rented to petitioners at a monthly lease rent of $ 2,600. On June 12, 1978, Capital issued a check payable to Chagra & Chagra Attorneys at Law Trust Account in the amount of $ 88,000. On July 14, 1978, check 511 on the Chagra and Chagra Attorneys at Law Trust Account was issued in the amount of $ 86,140.41 and stubbed "purchase of a cashier's check for payment of Jim Chagra taxes." Check 512 was written to Lee Chagra in the amount of $ 1,859.59 and stubbed "return of balance of Jim Chagra's taxes." Capital listed on its corporate books the $ 88,000 as a receivable from petitioner. Petitioner never executed any evidence of indebtedness with respect to this payment, nor did he satisfy the debt. However, a $ 5,000 payment was made against the purported indebtedness by an unidentified individual during the course of the year. Chagra was the president of Capital *431 for an unspecified period of time. Capital withheld Federal income taxes from Chagra's salary, as well as FICA taxes. Following petitioner's incarceration, Mrs. Chagra served as president of the corporation, also for an unspecified period of time. As president, Mrs. Chagra executed documents permitting the sale of the two properties owned by Capital in 1980 and the disbursement of funds to herself. c. The Doniphan Property
In June 1978, four lots located on Doniphan street (4716, 4720, 4724, and 4728 Doniphan) in El Paso, Texas (the "Doniphan property") were purchased in the names of Joseph Chagra and Lee Chagra, petitioner's brothers. The total cost of these lots was $ 67,788.26, of which $ 3,000 was paid in cash. The remaining $ 64,788 was paid by two checks, each written on an account at the First State Bank in El Paso under the name of "Joseph S. Chagra, Attorney at Law." On or about the date of each of these checks, a deposit was made into the account to cover the amounts of the checks. The source of these funds is unknown. Joseph Chagra and his wife, Patricia, executed promissory notes to the following persons and in the following amounts: Johanna G. Avritt (July 5, 1978)
$ 18,113.28
Johanna G. Avritt (September 9, 1978)
23,419.99
Willis D. Avritt (August 1, 1978)
39,609.01
$ 81,142.28
*432 In 1978, Ambrosio Serrano was paid a total of $ 63,000 to construct a kennel on the Doniphan property. This amount was paid in several installments by personal check or cashiers check. The kennel was operated as "Spa for Paws" by Spa for Paws, Inc., a Texas corporation. Spa for Paws, Inc. paid rent to Joseph Chagra for the use of the property. Petitioner had conversations with Mrs. Chagra following his incarceration in which he claimed that he paid for the Doniphan property. A few days later, he discussed the kennel with Joseph Chagra and again claimed that the kennel property belonged to him. d. Gambling in Las Vegas
Chagra gambled while he lived in Las Vegas. He stayed at Ceasar's Palace casino awaiting the completion of renovation on the Viking Drive property, and he gambled there. The establishment granted him a line of credit. On one occasion, Chagra incurred a gambling debt in the amount of $ 915,000. He paid this debt with cash kept in a footlocker located in his Ceasar's Palace suite. e. Other Expenditures
Petitioners made other expenditures during 1978. Chagra paid Vivian Chagra, his former wife, a total of $ 12,000 for child support and maintenance *433 for his children during 1978. He also purchased a 1978 Mercedes Benz automobile for $ 42,800 and a 1979 Sleekcraft 25'6" open fiberglass jet motorboat from Blake Esauk's Holiday Marine in Las Vegas for $ 13,353. In 1978, Chagra paid $ 100,000 to attorney Joseph Oteri for legal consultation with respect to narcotics smuggling charges which became the subject of an indictment returned against Chagra on September 28, 1980. Records concerning the substance of the representation were destroyed by a flood in Oteri's law offices. The fee also encompassed advice concerning the filing of Federal tax returns upon which the Fifth Amendment is claimed and a proposed legal action by Lee Chagra against the DEA for harassment. The action by Lee Chagra never materialized due to Lee Chagra's death in December 1978. Oteri's law firm also paid $ 1,860 in rent and expenses on a Boston, Massachusetts (Harbor Towers), property on behalf of petitioners. Chagra made expenditures relating to illegal narcotics during 1978. In January 1978, Wallace travelled to Aruba to deliver $ 130,000 from Chagra to Raul Royce. Also during January 1978, Wallace travelled to Juarez, Mexico to deliver $ 50,000 each *434 to Jose Barros and Omar Mahias. On the same trip, Wallace delivered $ 40,000 of $ 140,000 which Chagra had given him to Patsy de la Torres, Chagra's sister. Wallace kept the remaining $ 100,000. In January 1978, Chagra arranged for 400 pounds of marijuana to be delivered to Joe Kinney. Sometime after March, Chagra paid Wallace $ 45,000 through John Quitoni, one of Chagra's associates in Ft. Lauderdale. Petitioner paid $ 75,000 for the (attempted) assassination of Assistant United States Attorney James W. Kerr, Jr. f. The 1978 Return
Chagra submitted the information used to prepare his 1978 return to a tax return preparer, who may have been Michael Singer. Petitioners timely filed a joint Form 1040 for 1978. On the return, petitioners reported wage, salary, or other compensation from Capital, and net business income from gambling in the amount of $ 1,311,292. They claimed a deduction of $ 122,500 for legal and professional services incurred in connection with gambling. On March 26, 1982, petitioners submitted a Form 1040X, amended Federal income tax return, for 1978, to claim a net operating loss carryback and a refund of taxes paid. The Form 1040X was not processed *435 by the IRS. 3. 1979
Respondent adjusted petitioners' 1979 income using the specific item method. Respondent's agent utilized a newspaper article which reported that Jack Binion (Binion), president of the Horseshoe Hotel and Casino, stated that Chagra won $ 2,000,000 at the Horseshoe Casino during 1979. These statements were purportedly made by Binion in his testimony at the Chagra drug trial. Binion did not have personal knowledge of Chagra's successes in gambling at the Horseshoe, except to the extent of approximately $ 400,000 of wins, but instead relied upon information provided by his pit bosses. As he received information from the bosses, Binion tabulated the figures in his head, which totaled, in his recollection, $ 1.9 million by August 1979. The Horseshoe Casino did not keep records of the wins or losses of a customer. Respondent's agent performed no investigation with regard to Chagra's purported gambling winnings at the Horseshoe Casino, such as interviewing petitioners or asking them to submit additional information. He conducted a source and expenditure of funds analysis for 1979, but that analysis resulted in omitted income of less than $ 2,000,000. Respondent *436 based his determination of deficiency on the specific item method, relying upon the newspaper article. Petitioner was very close to his brother Lee, who was murdered in his El Paso law offices on December 23, 1978. Chagra was grief stricken by Lee Chagra's death and subsequently engaged in heavy gambling. He gambled recklessly, winning and, more often, losing large amounts of money in short periods of time. Petitioners filed their joint income tax return for 1979 on March 26, 1982. On a Schedule C attached to the return, Chagra reported $ 30,000 of gross receipts or sales. He claimed a deduction for legal services in the amount of $ 342,344, and a deduction for cost of goods sold in the amount of $ 70,000. The nature of the business and the goods sold were undisclosed; Chagra entered "Privileged" where this information was requested. A total loss of $ 382,344 was claimed. 4. 1980
Respondent recomputed petitioners' income for 1980 using the source and expenditure of funds method. His computation as set forth in the notice of deficiency and as supplemented in his amendment to answer and pursuant to respondent's alternative computation is summarized as follows: Per Notice of
Per Amendment
SOURCES OF FUNDS:
Deficiency
to Answer
AGI per return  $ 0.00 $ 0.00      Sublease 4010 Santa Ana  2,000.00
2,000.00  Tumbleweed Travel  803.00
803.00  Neill Ross, MD (Refund)  3.00
3.00  Air. Def. Cen. Fed. Cr. Union  4,000.00
4,000.00  Treasurer of the US  150.00
150.00  Other Funds  900.00
900.00  Goodman, Oshins, Brown Trust  27.00
27.00  Ronald & Tycha Stading  310.00
310.00  Marriott Hotels  4.00
4.00  Yankee Farms  60,000.00
60,000.00  Pine Tree- Godfrey Residences  80,000.00
80,000.00  Sears, Roebuck  106.00
106.00  TOTAL SOURCES OF FUNDS
$ 148,303.00
$ 148,303.00  EXPENDITURE OF FUNDS:
Personal Disbursements- Cash  $ 105,160.00  $ 105,160.00  Increase in Bank Balance #127-046-0  2,365.00  2,365.00  Personal Disbursements #127-046-0  150,865.00  150,865.00  Cash on Hand- Seizure  187,000.00  187,000.00  1979 Mercury Zephyr  2,979.00  2,979.00  Carol Unger  1,484.00  1,484.00  Disbursement- Kansas City, MO  3,232.00  3,232.00  Plane Rental  3,495.00  3,495.00  Josephine Chagra  50,000.00  50,000.00  Legal Fees per Return  106,054.00  106,054.00  Bob Gillette- Jewelry  29,440.00  29,440.00  Reinhart's Fine Furniture  68,051.00  68,051.00  Bob Gillette- Jewelry  100,000.00  100,000.00  Silver Coins  101,000.00  101,000.00  1979 Itasca Winnebago Motor Home  23,000.00  23,000.00  Rico Construction  58,910.00  58,910.00  Purchase of Santa Anita  10,000.00  Purchase of Santa Anita  85,000.00  Oscar Goodman  50,000.00  Rico Construction  (12,000.00) TOTAL EXPENDITURE OF FUNDS:
$ 993,035.00
$ 1,126,035.00
UNDERSTATEMENT OF INCOME:
$ 844,732.00
$ 977,732.00
*437 Per Alternative
SOURCES OF FUNDS:
Computation
AGI per return  $ 0.00       Sublease 4010 Santa Ana  2,000.00   Tumbleweed Travel  803.00   Neill Ross, MD (Refund)  3.00   Air. Def. Cen. Fed. Cr. Union  4,000.00   Treasurer of the US  150.00   Other Funds  900.00   Goodman, Oshins, Brown Trust  27.00   Ronald & Tycha Stading  310.00   Marriott Hotels  4.00   Yankee Farms  60,000.00   Pine Tree- Godfrey Residences  80,000.00   Sears, Roebuck  106.00   TOTAL SOURCES OF FUNDS
$ 148,303.00   EXPENDITURE OF FUNDS:
Personal Disbursements- Cash  $ 105,160.00   Increase in Bank Balance #127-046-0  3,806.00   Personal Disbursements #127-046-0  150,865.00   Cash on Hand- Seizure  187,000.00   1979 Mercury Zephyr  2,979.00   Carol Unger  1,484.00   Disbursement- Kansas City, MO  3,232.00   Plane Rental  3,495.00   Josephine Chagra  50,000.00   Legal Fees per Return  106,054.00   Bob Gillette- Jewelry  29,440.00   Reinhart's Fine Furniture  68,051.00   Bob Gillette- Jewelry  100,000.00   Silver Coins  101,000.00   1979 Itasca Winnebago Motor Home  23,000.00   Rico Construction  58,910.00   Purchase of Santa Anita  * 0.00   Purchase of Santa Anita  * 0.00   Oscar Goodman  50,000.00   Rico Construction  (12,000.00)  TOTAL EXPENDITURE OF FUNDS:
$ 1,032,476.00  UNDERSTATEMENT OF INCOME:
$ 884,173.00  *438 a. Expenditures
During 1980, petitioners maintained residences in Las Vegas, Nevada, Kansas City, Missouri, and El Paso, Texas. Mrs. Chagra resided in El Paso, Texas. From September 1979, until February 1980, Chagra was a fugitive from the law. He was apprehended and arrested on February 22, 1980, in Las Vegas, Nevada. At the time of Chagra's arrest, $ 187,000 in United States currency was seized from his person. This amount was turned over to the Government, which applied it against petitioners' outstanding Federal income tax liabilities. Substantial expenditures were made by or on behalf of petitioners during 1980. Chagra rented the Kansas City residence from Carol Unger. Mrs. Chagra received a statement from Mrs. Unger, dated September 4, 1980, for payment of her portion of damages incurred to the property. Petitioners paid $ 1,484 for damages *439 to this property. Mrs. Chagra purchased a 1979 Mercury Zephyr from North Hills Lincoln Mercury Mazda in Kansas City in January 1980, using an assumed name. The purchase price of this automobile was $ 2,979, which was paid in cash. In 1980, petitioners also purchased a 1979 30-foot Itasca "Sunflyer" Winnebago motor home for $ 23,000 in the name of "Christopher P. Titchell." Petitioners purchased other personal items during 1980 using assumed names. The amounts expended for these miscellaneous items totaled $ 3,232. Petitioners gave $ 50,000 to Josephine Chagra, petitioner's mother, in 1980. Cash expenditures for Mrs. Chagra were monitored by Eddie Nichols, Mrs. Chagra's brother, and Mrs. Chagra's sister, Mary Lou Martinez. A total of $ 105,160 was expended on her behalf, not including the expenditures for furniture at Reinhart's Fine Furniture and Gifts and payments made to Rico Construction. An account styled "Joseph S. Chagra Trust Account", Account No. 127-046-0 at the First State Bank in El Paso, Texas, was used to pay bills incurred by or on behalf of Mrs. Chagra commencing in 1980. The beginning balance in the account on May 6, 1980, was $ 60.49, and the account had *440 an ending balance on December 31 of $ 3,866.53. The increase in the bank balance for 1980 was $ 3,806.04. Mrs. Chagra and Joseph Chagra purchased real property located in El Paso, Texas, for petitioners' chilcren as trustees. The $ 95,000 purchase price of the property was paid for by check drawn on the Joseph S. Chagra Trust Account. A total of $ 150,865 was withdrawn from the Joseph S. Chagra Trust Account for Mrs. Chagra during 1980. Mrs. Chagra made several large cash purchases herself during 1980. She purchased a total of $ 68,050,81 in furniture from Reinhart's Fine Furniture and Gifts in El Paso, Texas. These purchases were paid in cash, which she often left on account under an assumed name at the store. Mrs. Chagra also purchased jewelry, including three rings, and bags of silver coins through Bob Gillette in El Paso. The cost of the jewelry was $ 129,440 and the cost of the silver coins was $ 101,000, which Joseph Chagra paid in cash on her behalf. Mrs. Chagra also rented a Lear jet on October 23, 1980, for which she paid $ 3,495. Rico Construction was hired by Mrs. Chagra to renovate her home in El Paso. She paid the firm a total of $ 46,910 for services in 1980. *441 Following petitioner's incarceration, Mrs. Chagra served as president of Capital. During 1980, Mrs. Chagra participated in the liquidation of the holdings of Capital as its president. In that capacity, she executed contracts for the sale of the two houses owned by the corporation. The proceeds of the sale, $ 140,000, were remitted to her by the attorneys representing the corporation in the transactions. Mrs. Chagra executed a note in favor of Capital in the original principal amount of $ 140,000 on March 1, 1980. No payments on this note were ever made, nor was payment of the principal balance requested. After the sale of the houses, Capital did not engage in further business. Mrs. Chagra received several checks representing nontaxable income, which are itemized as follows: 10/27/80
Tumbleweed Travel
$ 803.00   10/20/80
Neill Ross, M.D.
3.00
12/03/80
Leon or Olivia Nichols
2,000.00
12/0/80 Leon Nichols
2,000.00
11/28/80
Treasurer of the United States
150.00
6/06/80
Goodman, Oshins, Brown & Singer
26.97
5/28/80
Ronald or Tycha Stading, Trustees
* 309.96
7/31/80
Marriott Hotels
3.85
4/06/80
Frank Guilford, Special Account
* 60,000.00
4/08/80
Turner, Hendrick, Guilford, Goldstein
& McDonald Trust Account   * 80,000.00
12/04/80
Sears Roebuck
106.11
*442 These checks total $ 145,402.89. Some of petitioners' property was forfeited to the United States for nonpayment of taxes during 1980. In addition to the cash seized from Chagra's person at the time he was apprehended on February 22, 1980, the Winnebago motor home was forfeited on June 6, 1980; the Viking Drive residence was forfeited in July 1980; and the Mercury Cougar was seized and sold, with the proceeds of the sale applied to the taxes due from petitioners in October 1980. b. The 1980 Return
Petitioners filed a joint 1980 Federal income tax return on March 26, 1982. On the return, they reported no taxable income and claimed a deduction for legal expenses totaling $ 106,053: $ 75,000 and $ 6,054 paid to Joseph Chagra and $ 25,000 paid to Oscar Goodman. 5. 1981
For 1981, respondent recomputed petitioners' income using the source and expenditure of funds method. His computation as set forth *443 in the notice of deficiency is summarized as follows: Source of funds:
AGI per Return  -0-
Treasurer of the United States  $ 150    Other non-taxable Sources of funds  -0-
TOTAL SOURCES OF FUNDS:
$ 150    Expenditure of Funds:
Legal Fees per Return  $ 35,000 Reinhart's Fine Furniture  4,300
Cash on Hand  3,586
TOTAL EXPENDITURE OF FUNDS:
$ 42,886 UNDERSTATEMENT OF INCOME:
$ 42,736 During 1981, petitioner was incarcerated in a Federal prison. Mrs. Chagra participated in no income-producing activities during 1981. Mrs. Chagra's El Paso residence and the residences of other persons in El Paso were raided on February 26 or 27, 1981. Items of property and cash were seized from the residences. A purse belonging to Mrs. Chagra was searched during the raid on her home and $ 3,586 in cash was seized from it. Jewelry belonging to Mrs. Chagra was seized from her mother's residence. All assets seized, other than those assets seized from the residence of Joseph Chagra, have been retained by the IRS or sold and applied against outstanding income tax liabilities of petitioners. Mrs. Chagra purchased furniture from Reinhart's Fine Furniture and Gifts in El *444 Paso during 1981. She made one cash payment on the account of E.C. Cash on January 21, 1981, in the amount of $ 4,300. In 1981, a total of $ 35,000 belonging to petitioners was paid to attorney Oscar B. Goodman for representation of Chagra on charges brought against him for smuggling operations either in Massachusetts or in Texas. Petitioners timely filed a joint Federal income tax return for 1981. The return was prepared by Robert Henderson, who did not contact Chagra directly with respect to its preparation. The return was prepared from information contained in a memorandum from Towner Leeper, Chagra's counsel, and addressed to Mrs. Chagra. Mrs. Chagra executed the Form 1040 in blank and information was filled in later. OPINION As a general matter, respondent's determinations are presumed to be correct, and petitioners have the burden of proof to show that respondent's determinations are erroneous. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). There are, however, a number of exceptions to the general rule. Respondent has the burden of showing the correctness of increases in deficiencies asserted in his answer. Rule 142(a). Where it is demonstrated *445 that a notice of deficiency is arbitrarily excessive or without foundation, the burden of going forward with the evidence is shifted to respondent. Helvering v. Taylor, 293 U.S. 507, 79 L. Ed. 623, 55 S. Ct. 287 (1935); Pizzarello v. United States, 408 F.2d 579 (2d Cir. 1969); Jackson v. Commissioner, 73 T.C. 394 (1979). Before addressing the substantive issues present in this case, we must decide whether assessment of any deficiency for either 1977 or 1978 is barred by the statute of limitations as alleged by petitioners. Cox v. Commissioner, T.C. Memo 1985-324. Since the notice of deficiency was mailed more than 3 years after the 1977 and 1978 returns were filed, assessment of any deficiency is barred by the general 3-year statute of limitations under section 6501(a), unless one of the exceptions applies. Respondent relies upon section 6501(h) and 6501(c)(1). 1. Statute of Limitations
With respect to 1977, we note that petitioner initially filed a separate return. The parties have stipulated that Mrs. Chagra did not engage in any income-producing activities during 1977. The Form 1040X executed by both petitioners and *446 submitted in March 1982 was, among other things, apparently an attempt by petitioners to seek joint filing status. However, respondent did not process the Form 1040X which sought a refund in the amount of $ 33,405. The treatment of amended returns is a matter of internal administration within the discretion of the Commissioner. Koch v. Alexander, 561 F.2d 1115, 1117 (4th Cir. 1977); Miskovsky v. United States, 414 F.2d 954, 955 n.4 (3d Cir. 1969); Kearney v. A'Hearn, 210 F. Supp. 10, 16 (S.D.N.Y. 1962), affd. per curiam 309 F.2d 487 (2d Cir. 1962). Neither of the parties have provided any explanation as to these events nor have they presented argument as to how these events affect the statute of limitations. However, based on this record we conclude that there can be no deficiency against Mrs. Chagra for 1977. The record contains no facts to suggest that Mrs. Chagra was required to file a return for that year, [3] and respondent agrees that she did not file an original return for that year. The Form 1040X submitted in March 1982 would not be an effective election by petitioners to file a joint return *447 after filing a separate return since the Form 1040X was untimely. Sec. 6013(b)(2)(B). *448 With respect to both 1977 and 1978, the notice of deficiency was issued more than 3 years after filing of the 1977 and 1978 returns. Respondent argues that the statutory period for assessment has not run because at least part of the deficiencies for 1977 and 1978 is due to a net operating loss carried back from 1979 to 1977 and 1978. Where the party pleading the bar of the statute of limitations makes a showing that the statutory notice was issued beyond the normally applicable statute of limitations, the burden of going forward with the evidence shifts to the other side. That party has the burden of introducing evidence to show that the bar of the statute is not applicable. Where he makes such a showing, the burden of going forward with the evidence is again shifted back to the party pleading the statute to show that the alleged exception is invalid or otherwise not applicable. However, the burden of proof (burden of ultimate persuasion) never shifts from the party who pleads the bar of the statute of limitations. Adler v. Commissioner, 85 T.C. 535, 540 (1985). Respondent cites section 6501(h) as a basis for extending the normal 3-year statute of limitations. *449 As relevant here, section 6501(h) provides that a deficiency attributable to the application of a net operating loss carryback may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss which results in the carryback may be assessed. A review of the record reveals that Forms 1040X were filed on March 26, 1982, for each of the years 1977 and 1978, along with the 1979 return which claimed a loss of $ 382,344. Net operating loss carrybacks were claimed on the Forms 1040X. However, respondent did not process the amended returns. There is no indication that refunds were issued in response to the Forms 1040X. The deficiencies determined for 1977 and 1978 do not consider the Forms 1040X and the claimed net operating loss carryback since no refunds or carrybacks were allowed for either of those years. Thus, respondent's position that the 1977 and 1978 years are open under section 6501(h) is erroneous. The deficiencies for 1977 and 1978 are not due in whole or in part to the allowance of a net operating loss carryback. The Forms 1040X filed in 1982 do not affect the running of the period of limitations with *450 respect to the original returns for 1977 and 1978. Northern Anthracite Coal Co. v. Commissioner, 21 B.T.A. 1116 (1931); Orrock v. Commissioner, T.C. Memo 1982-293. The statute of limitations therefore precludes respondent from assessing and collecting the deficiencies and additions to tax for 1977 (against Chagra) and 1978 (against Mr. and Mrs. Chagra), unless respondent proves that petitioners' returns were false or fraudulent with the intent to evade tax. Sec. 6501. The elements of fraud under section 6501(c) for limitations purposes are essentially the same as the elements of fraud under section 6653(b). Tomlinson v. Lefkowitz, 334 F.2d 262 (5th Cir. 1964); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160 (1976). Respondent has the burden of establishing by clear and convincing evidence the elements of fraud for the section 6653(b) addition. Sec. 7454; Rule 142(b); Zack v. Commissioner, 692 F.2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Stone v. Commissioner, 56 T.C. 213, 220 (1971). When fraud allegations are inextricably intertwined *451 with alleged omissions of income, both of which depend upon the accuracy of respondent's source and expenditure of funds method of proof (specific item method of proof for 1979), we must be cautious not to rely on a taxpayer's failure to carry his burden of proof with respect to the underlying deficiencies in deciding whether respondent has carried his burden of proof with respect to fraud. See Drieborg v. Commissioner, 225 F.2d 216, 218 (6th Cir. 1955), affg. in part, revg. in part a Memorandum Opinion of this Court; Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969); Hamilton v. Commissioner, T.C. Memo 1987-278. Additionally, respondent claimed increased deficiencies for the taxable years 1977, 1978, and 1980 in his amendment to answer. There is no question that respondent has the burden of proof as to the increased deficiencies. Rule 142(a). Accordingly, we need not address the correctness of the deficiencies for 1977 and 1978 unless and until we conclude that respondent has carried his burden of establishing fraud for those years. Respondent *452 must establish by clear and convincing evidence that (1) there was an underpayment of tax and (2) some part of such underpayment of tax for each year was due to fraud. Since there must be an underpayment of tax to which the addition may attach, the existence of an underpayment is an element of fraud which respondent must establish. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). For section 6653(b) to apply, respondent need only establish that part of the underpayment was due to fraud, even though the addition attaches to the entire underpayment. Stewart v. Commissioner, 66 T.C. 54 (1976). Respondent is not required to establish the precise amount by which a taxpayer underpaid his taxes, but he must prove that the taxpayer has, to some extent, underpaid his taxes. As discussed below, we hold that respondent adequately established an underpayment of petitioner's tax for 1977 and an underpayment of petitioners' tax for 1978. We also hold that the underpayments were due to fraud, so that by virtue of section 6501(c)(1) respondent is not barred from assessing the deficiencies which he determined for those years. 2. Reconstruction of *453 Income
Respondent's proof of an underpayment of tax for 1977 and 1978 consists of a source and expenditure of funds method reconstruction of income. A taxpayer is required to retain sufficient records from which his true income can be determined. Sec. 6001. Where his records are incomplete or inaccurate, the Secretary is authorized to reconstruct the taxpayer's income in accordance with any reasonable method that accurately reflects actual income. Secs. 446(b), 6001; Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). The IRS has great latitude in reconstructing income and may employ any of a wide selection of methods to do so. Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968), affd. on other grounds 394 U.S. 316, 22 L. Ed. 2d 302, 89 S. Ct. 1099 (1969); Ramsey v. Commissioner, T.C. Memo 1980-59; Bolton v. Commissioner, T.C. Memo 1975-373. The reconstruction need only be reasonable in light of all surrounding facts and circumstances. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). *454 Since each year is a separate taxable period, respondent may utilize different methods of reconstructing a taxpayer's income for different years. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 75 L. Ed. 383, 51 S. Ct. 150 (1931); Faraoni v. Commissioner, a Memorandum Opinion of this Court dated January 29, 1954. Respondent used the source and expenditure of funds method to recompute petitioners' income for years 1977, 1978, 1980 and 1981. He used the specific item method to recompute income for 1979. The use of indirect methods to establish an underpayment of tax has been approved. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954) (net worth method); United States v. Johnson, 319 U.S. 503, 87 L. Ed. 1546, 63 S. Ct. 1233 (1943) (cash expenditures method). This Court has approved the use of the source and expenditure of funds method of reconstructing income. Meier v. Commissioner, 91 T.C. 273, 295-296 (1988). At the outset, petitioners challenge respondent's use of the source and expenditure of funds method, arguing that the use is flawed since respondent did not establish a starting net worth for the beginning of the period. They also maintain that respondent *455 should have established a starting net worth for each of the periods at issue. Finally, petitioners claim that respondent erred by not crediting them with cash on hand at the beginning of any of the periods, in light of evidence that petitioners heavily transacted in cash. They cited Olinger v. Commissioner, 234 F.2d 823 (5th Cir. 1956), affg. in part, revg. in part a Memorandum Opinion of this Court as supporting their argument. The Court of Appeals for the Third Circuit defined the cash expenditures method in United States v. Caserta, 199 F.2d 905, 907 (3d Cir. 1952), as follows: It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received.
The source and expenditure of funds method differs from the cash expenditures method only slightly in that it *456 credits the taxpayers with all sources of income, both taxable and nontaxable, when determining the amount of understated income. [4] It is premised on the assumption that the amount by which a taxpayer's expenditure of funds exceeds his known sources of income during a taxable period is attributable to taxable income, absent some showing by the taxpayer of a nontaxable source. DeVenney v. Commissioner, 85 T.C. 927, 930-931 (1985). The procedural safeguards which the Supreme Court outlined for use of the net worth method of proof are applicable to the use of the source and expenditure of funds method. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954); United States v. Citron, 783 F.2d 307, 315-316 (2d Cir. 1986). *457 Generally, starting and ending net worth figures are necessary to account for expenditures which may be attributed to funds generated by the disposition of an asset on hand at the beginning of the period. Holland v. United States, 348 U.S. at 132-133. However, this rule has been relaxed in recognition of the differences between the net worth method and the source and expenditure of funds method. The net worth method of reconstructing unreported income involves ascertaining the taxpayer's net worth positions at the beginning and end of the period. Any increase in net worth is attributed to unreported taxable income, except to the extent attributable to reported income. The expenditures method of establishing unreported income is often used with respect to taxpayers who consume their income. Since these taxpayers do not invest their income in assets which remain to be counted at the end of the period, the method reconstructs income by establishing the amount of purchases of goods and services not attributable to resources on hand at the beginning of the year or to nontaxable receipts during the year. Taglianetti v. United States, 398 F.2d at 562-563. *458 In some cases, such as here, sufficient records to compute a reliable starting net worth are absent. A starting net worth may be substituted by establishing the extent to which assets on hand were used to pay for the expenditures. The court in Taglianetti v. United States, 398 F.2d 558, 565 (1st Cir. 1968), described the requirement: In a typical net worth case, [such] as [the one in] Holland [v. United States, 348 U.S. 121, 75 S. Ct. 127, 99 L. Ed. 150 (1954)], precise figures would have to be attached to opening and closing net worth positions for each of the taxable years to provide a basis for the critical subtraction. In a cash expenditures case reasonable certainty may be established without such a presentation [of precise opening and closing net worth figures], as long as the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to [the] expenditures.
In their opening brief, petitioners cite Olinger v. Commissioner, 234 F.2d 823 (5th Cir. 1956), affg. in part and revg. in part a Memorandum Opinion of this Court, as supporting their position with regard *459 to the cash on hand argument, infra. The opinion does not support any of their arguments. Although the court did utter the oft-cited standard for applying the cash expenditures method of reconstructing income, its cautionary language refers to the instance where the use of the method is so ill-developed that neither a beginning nor an ending reference point was established. Additionally, in Olinger v. Commissioner, supra the Government relied upon the presumption of correctness and its poorly developed case (which consisted only of evidence of one expenditure) to support a finding of fraud. While affirming the underlying deficiency in the case, because the taxpayer did not disprove the Government's determination, the court held that the Government did not sufficiently prove fraud. The court in Taglianetti v. United States, supra also considered the language from Olinger v. Commissioner, supra and concluded that it did not call for an "inflexible formal requirement" such as formal net worth statements or similar evidence. Taglianetti v. United States, 398 F.2d at 565, 565 n.7. Applying *460 the foregoing rules, we will decide whether petitioners' assets on hand contributed to petitioners' expenditures, which greatly exceeded their reported income for the years 1977 and 1978, and for 1980 and 1981. The house in which petitioners resided at the beginning of 1977 was owned by Capital and rented to petitioners. Consequently, disposition of the home following petitioners' move to Las Vegas is not a potential source of funds from which petitioners' expenditures could be made. The evidence establishes that petitioners acquired many assets during 1977 and 1978. However, petitioners did not dispose of any of their property during the years in issue in order to fund the expenditures in question. As a matter of fact, a great many of petitioners' assets were seized and sold by respondent during 1980 or 1981, and the proceeds applied against taxes due from petitioners. [5] Other of their assets remain in the possession of the Government pending the outcome of this case. We may infer from these facts that these assets were not sold during the years in question and, therefore, that they did not account for any of the expenditures made by petitioners during the years in issue. *461 Respondent's evidence establishes either that petitioners' assets remained at a static level or increased during the years in issue. The evidence here makes clear that petitioners' beginning resources did not make any contribution to petitioners' expenditures during the years in question. Thus, the "reasonable certainty" requirement of Holland v. United States, supra is established without the necessity for a firm opening net worth for 1977. Taglianetti v. United States, 398 F.2d at 564-565. Since respondent's source and expenditure of funds method was interrupted in 1979 by use of the specific items method, this analysis must also be applied to 1980 to determine whether the requirement of a firm opening net worth for that year is likewise satisfied. Based on the record in this case, we likewise conclude that respondent has sufficiently *462 shown that disposition of assets on hand did not contribute to petitioners' expenditures during 1980 and 1981. On a related point, petitioners also argue that respondent should have computed starting net worth for each of the succeeding periods. The Government does not have to re-establish the taxpayer's net worth at the beginning of each taxable year with evidence independent of the other years. United States v. Marrinson, 832 F.2d 1465, 1470 (7th Cir. 1987); United States v. Goldstein, 685 F.2d 179, 181 (7th Cir. 1982). The opinion in Holland v. United States, supra does not require a formal net worth statement as of the beginning of each period, but only that increases in net worth be reasonably allocated to the appropriate tax year. United States v. Mastropieri685 F.2d 776, 784 (2d Cir. 1982). The Government may satisfy its burden of reasonably allocating net worth increases by showing that in each of the years in issue the taxpayer's expenditures exceeded the opening balance, increased by any known nontaxable sources of funds. United States v. Mastropieri, supra. *463 Petitioners here expended much more money than was reported on their returns. They did not dispose of assets to generate additional funds from which expenditures could be made in later years. Respondent has credited petitioners with nontaxable sources of income for several of the years at issue. Based on this and other factors appearing in the record, the fact that respondent did not, per se, present computations of starting net worth for each of the 4 taxable years here involved does not affect the validity of his analysis. In their last argument against respondent's use of the source and expenditure of funds method, petitioners challenge respondent's method because respondent did not credit them with any cash on hand at the beginning of any period. Cash which a taxpayer has on hand at the beginning of the period should be included as an asset on hand to prevent double inclusion of income. But, it is possible to arrive at the conclusion that a taxpayer had no cash on hand, using the source and expenditure of funds analysis, by demonstrating that a taxpayer simply spent more than he otherwise had available to him during that time. United States v. Marrinson, supra; *464 United States v. Terrell, 754 F.2d 1139, 1147 (5th Cir. 1982). We have already addressed petitioners' reliance on Olinger v. Commissioner, supra.
The revenue agent who examined petitioners' returns testified that he did not credit petitioners with any cash on hand because there was no identifiable cash on hand at the beginning of any of the tax periods. When Chagra's 1973, 1974, and 1975 returns were examined, Chagra's counsel did not raise any issue as to cash on hand and adjustments were reached by agreement between that counsel and agents of the IRS. Petitioners never identified any amounts of cash on hand at the beginning of any of the periods. Chagra stated in responses to interrogatories that he had several millions of dollars in cash on December 31, 1976, but that he was broke in 1977. At trial, he was unable to identify how much cash he had on hand at the end of the next 4 years or even whether he had any cash at the beginning of those periods. However, in July 1977, Chagra was concerned that the IRS would attach his house for taxes. In fact, it was stipulated that several of Chagra's assets, including his residence in El *465 Paso, Texas, were seized by the IRS in 1977 to be applied against unpaid tax assessments. These facts are inconsistent with possession of a cash hoard during that time. As well, petitioners' actions hindered respondent's efforts to determine whether petitioners had cash on hand at the beginning of any of the years. Petitioners each frequently transacted in cash and in large sums. They did not maintain records of bank accounts and often used family members and alias names to shield money and other assets from detection. This pattern of hiding assets and cash was typical of years 1977 through 1980. Petitioners did not present evidence, other than Chagra's vague testimony, of cash on hand at the beginning of any period. Respondent established that petitioners spent more than the money they allegedly had available to them during those periods. This is sufficient to establish that, for the years following 1977, the amount of opening cash on hand is zero. As to 1977, we sustain respondent's determination that petitioners had no cash on hand at the beginning of 1977. Having addressed petitioners' substantive arguments concerning reconstruction of their income, we conclude respondent's *466 method of recomputing income for 1977, 1978, 1980, and 1981 using the source and expenditure of funds method is not erroneous. We now turn to the specific expenditures of each year in order. 3. 1977
1977 is a year for which respondent relies upon the fraud exception to the statute of limitations on assessment. Consequently, respondent must prove an underpayment of tax, of which part is attributable to fraud. As to expenditures alleged in respondent's amendment to answer, respondent also has the burden of proof. Before we discuss the specific expenditures alleged for 1977, we will consider two evidentiary matters. a. Expenditures for Narcotics
At trial, respondent offered the testimony of a drug enforcement officer with respect to the prices of marijuana and cocaine in the western United States and in Florida during the years at issue. Petitioners objected to the testimony of the agent, which included opinions regarding the profit a drug dealer could expect to make in trafficking in such substances. The basis of their objection was that respondent did not comply with Rule 143(f) relating to the testimony of expert witnesses. Respondent's counsel countered that *467 he was offering the witness as a fact witness and not an expert. The Court took petitioners' objection and motion to strike testimony under advisement. Generally, a witness may only testify as to facts of which he has firsthand, personal knowledge. Fed. R. Evid. 602; United States v. Evans, 484 F.2d 1178, 1187 (2d Cir. 1973). However, an exception to this rule is made for expert witnesses. Expert witnesses are not summoned to contribute their personal knowledge of the issue or transaction at issue, but to contribute their specialized knowledge of a field which is not possessed by a layman. Expert testimony is allowable where the information is necessary to assist the trier of fact. Fed. R. Evid. 702. The witness must have sufficient knowledge or experience in a pertinent field so as to make it appear that his opinion will aid the trier. An expert witness may also answer hypothetical questions and may, thus, testify from facts made known to him at trial. Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 404 (3d Cir. 1980). The distinction between lay and expert witnesses is relevant for another reason since the Court's rules *468 of procedure impose an affirmative obligation on the offeror of expert testimony. The offeror of expert testimony is required to notify the opposing party of that intention by furnishing a written report containing the qualifications of the witness and a summary of the matters to which the witness is expected to testify. Rule 143(f). The purpose of this rule is to allow the opposing party sufficient time to prepare for the witness. Sanctions for failure to comply with this rule include excluding the testimony of the proposed expert witness. Rule 143(f)(2). One who would testify to his opinion in matters requiring special training or experience to understand must be qualified as an expert in the field. Respondent did not attempt to qualify his witness as an expert for purposes of the witness' testimony. The witness did not testify as to facts concerning the investigation of petitioner, or to any facts relating to petitioners' case. Instead, he testified about knowledge of drug prices which he obtained through his long-term experience as a drug enforcement agent. His testimony was not specific to identified sales or purchases of narcotics. He further offered evidence concerning *469 the pricing practices typically followed by drug dealers and applied that information to hypothetical facts offered by respondent's counsel. The information was not applied to the facts of petitioners' case, except so far as respondent's hypothetical facts may be interpreted to approximate the facts of petitioners' case. It is well settled that the testimony of a drug enforcement officer with respect to the valuation of illegal narcotics is expert testimony. United States v. Golden, 532 F.2d 1244 (9th Cir. 1976) (agent's testimony on market price of heroin; properly based on information from other narcotics agents); United States v. Pugliese, 712 F.2d 1574, 1581 (2d Cir. 1983); United States v. Navarro-Varelas, 541 F.2d 1331 (9th Cir. 1976). Having reviewed the substance of the witness' testimony, we conclude that he is an expert witness.[6] His level of experience and expertise in the area of illicit narcotics may have permitted the Court to qualify him as an expert in that field. Although the witness was called as a summary or fact witness, his testimony exceeded the scope of either classification and he cannot reasonably *470 be said to have served in either capacity. The witness offered testimony based upon his specialized experience to assist the Court in placing a value on marijuana and cocaine allegedly purchased and/or sold by petitioner during the years in question. *471 A party cannot circumvent the requirement of Rule 143(f) by failing to qualify his witness as an expert and framing his examination to avoid testimony typical of expert witnesses. Respondent had an obligation to comply with the requirements of Rule 143(f)(1), including causing the witness to prepare a expert witness report as outlined in the rule and submitting it to the Court, and furnishing it to each other party at least 15 days prior to the call of the calendar on which this case appeared. [7] Since petitioners did not have access to the witness' conclusions and the bases therefor prior to trial, they were prejudiced by respondent's failure to comply with Rule 143(f). Based on the foregoing, petitioners' objection at trial to the testimony of respondent's witness has been sustained and their motion to strike the testimony has been granted. *472 b. Expenditures for Jewelry
With respect to the purchase of jewelry, the parties have stipulated to the purchase of the platinum ring with diamonds and the Rolex watch. The issue in dispute is the cost of the jewelry to petitioner. Petitioner could not recall what he paid for the ring, although he recalls paying approximately $ 1,000 for the watch. Petitioner also testified that he did not normally pay retail prices for jewelry. Mrs. Chagra testified that petitioner told her, at the time of purchase, that he paid $ 30,000 for the ring. She could not recall the amount paid for the watch. Respondent, in his notice of deficiency, valued the two items of jewelry at $ 107,500 based on its purported fair market value in 1981. At trial, respondent attempted to enter into evidence the appraisal reports and testimony of two experts. Petitioners objected on the grounds that respondent failed to comply with Rule 143(f). Respondent does not dispute that he failed to timely furnish a copy of the appraisal reports to petitioners' counsel. The Court took the matter under advisement and permitted respondent to proffer the reports and testimony. Petitioners further argued that, in *473 any event, the appraisals represent fair market value, not cost, and that it is cost which is the essential ingredient regarding the measure of expenditures. As previously noted, Rule 143(f) provides that an expert witness' testimony may be excluded altogether for failure to comply with the rule, unless the failure is shown to be for due cause and unless it does not unduly prejudice the opposing party. As the rule existed at the time of trial, respondent was required to submit to the Court and furnish to the opposing party the expert report not later than 15 days before the call of the trial calendar. Here, respondent did not mail the experts' reports to the Court and to petitioners' counsel until 10 days before the commencement of trial. Respondent argues that he had difficulty employing the experts and further incurred logistical problems in getting the items of jewelry to the appraiser. Respondent alleges that as soon as he received the reports, he immediately forwarded them to the Court and to opposing counsel. Respondent further argues that petitioners are not prejudiced because they have known that the cost of the jewelry was an issue since the notice of deficiency was *474 issued. In this regard, petitioners argue that the notice of deficiency was issued in 1985 and that respondent waited until soon before trial to hire his expert witnesses. Petitioners argue that they have effectively been denied an opportunity to cross-examine and counter the testimony of the experts. We are not satisfied that respondent has shown good cause for submission of the reports beyond the time prescribed in the rule. The petition in this case was filed in 1985. This matter had been set for trial on several occasions. Counsel for respondent had ample time to plan a trial strategy. We do not accept the reasons for the delay here. We are also satisfied that the delay involved may have affected the ability of petitioners' counsel to adequately cross-examine the expert witnesses. We have accordingly sustained petitioners' objection and the reports and testimony of respondent's two experts relating to the value of items of jewelry are not admissible and are not part of this record. Based on this record, we find that the watch cost $ 1,000 and the ring cost $ 30,000. c. Other Expenditures
One of the adjustments for 1977 is an expenditure to Raul Royce in the amount *475 of $ 353,000. This apparently represents the balance of $ 1,000,000 allegedly paid to Royce during 1977 and 1978. This amount was not part of the notice of deficiency, but was claimed by respondent in his amendment to answer. The basis for respondent's claim appears to come from a vague reference in testimony by Henry Wallace at the Chagra drug trial and again at the deposition for this proceeding. We are not satisfied that petitioner paid Royce $ 1,000,000 of which $ 353,000 was applied in 1977. The only evidence of this is that Wallace allegedly overheard a conversation between petitioner and a third party who asked what amounts petitioner had paid to Royce. Wallace was working with petitioner in his drug operation. Wallace agreed to testify against petitioner in order to reduce any charges that might be made against him. Clearly, his testimony at the Chagra drug trial and in this proceeding sought to move any liability away from himself and on to others. Accordingly, we will not sustain an expenditure of this amount based on so little evidence. With respect to respondent's source and expenditures method, respondent has proved that petitioner made some of the expenditures *476 set forth in his notice of deficiency and in his amended answer. On the other hand, we find either no evidence or insufficient evidence to support others of the alleged expenditures. In our findings of fact, we detailed those activities for which there was evidence of petitioners' having expended funds supporting respondent's reconstruction of income. We see no need to repeat those findings here. As a result of those findings, we hold that respondent adequately proved that petitioners made expenditures in 1977 as follows: Expenditure of Funds
Amount
Jewelry - Fort Lauderdale, Florida
$ 31,000 Attorney - Bogota, Colombia
10,000
Living expenses - Bogota, Colombia
5,000
Cash to Wallace in Colombia 11/77
5,000
Cash to Wallace in Florida 11/77
10,000
Cash to Wallace to Barros - Marijuana
80,000
Cash to Barros' Wife - Marijuana
20,000
Cash to Raul Royce in Colombia - Cocaine
40,000
Total
$ 201,000
4. 1978
Petitioners have agreed to certain expenditures as follows: Attorney's Fees
$ 100,000  Harbor Towers, Boston MA
1,860
Vivian Chagra
12,000
IRS voluntary payments- 1977
50,117
1976                        * 6,080
1975                        80,061
FICA W-1 per return
1,071
Withholding W-2 per return
20,772
1979 Sleekcraft
13,353
1978 Mercedes Benz
42,820
Gambling debt- footlocker
915,000
TOTAL
$ 1,243,134
*477 Respondent concedes the $ 500,000 expenditure for Lee Chagra's markers at Caesar's Palace casino. The remaining claimed expenditures, including additional expenditures raised by respondent in his amendment to answer, are in dispute. Since 1978 is a year in which respondent relies upon the fraud exception to the statute of limitation, respondent must prove an underpayment of tax which is due, at least in part, to fraud. With respect to the additional expenditures raised in respondent's amendment to answer, he has the burden of proof in any event. We will discuss each expenditure separately. (a) Expenditures for Viking Street Home
In his notice of deficiency, respondent determined that petitioners expended $ 975,000 for the purchase and improvement of the house at Viking Drive. In his first alternative computation attached to *478 his reply brief, respondent asserts the expenditure for this item was $ 518,780. In his second alternative computation, respondent asserts that the expenditure was $ 336,165. Respondent does not explain how he arrived at his second alternative computation; however, it appears to be made up of three items: $ 245,000
(the purchase price of the property);
15,000
(water/sewer to the home and fencing); and
76,165
(payments to contractor during 1978)
$ 336,165
The parties do not dispute the $ 170,000 mortgage as a source of funds, and respondent has in fact allowed that amount as a source of funds in his reconstruction of petitioners' income for 1978. Petitioners argue that the expenditures for the purchase of the house should be as follows: Cash downpayment on purchase
$ 75,000 Payment to general contractor
76,165
Gas extension and fence
10,000
Total
$ 161,165
While we believe that a large sum of money may have been expended, it is far from clear in what year the expenditures were made to renovate the property. It is clear that all expenditures were not made during 1978. We note that the addition to the house, which seems to have been a major part *479 of the renovation, was not completed until after June 1979. We also note that respondent does not dispute that the contractor's records reflect that substantial work and payments were made after January 1979. Based on this record, we accept respondent's second alternative computation of $ 336,165. To this extent, respondent's expenditures analysis is adjusted. (b) Doniphan Property - El Paso, TX
Respondent in his notice of deficiency charged petitioner with expenditures for the purchase and improvement of lots on Doniphan Street in El Paso. Nevertheless, he has the burden of proof on this issue since he is relying upon the fraud exception to the statute of limitations to keep 1978 open to assessment. Rule 142(b). Petitioners stipulated the purchase price of the Doniphan property, as well as the cost of the improvements to that property. However, petitioners contend that the expenditures were in fact made by Chagra's brothers and should not be included in respondent's analysis. The Doniphan property was purchased in June 1978, for $ 67,788.26. The property was purchased in the name of petitioner's brothers, Joseph S. Chagra and Lee A. Chagra, and was paid for by checks *480 on the account of Joseph S. Chagra. A kennel known as "Spa for Paws" was constructed on the property. The sum of $ 63,000, in four checks, was paid to a contractor (Ambrosio Serrano) for construction of the kennel. Respondent attempted to show that the purchase of and improvements on the property were expenditures by petitioner. Even if we were to consider the transcripts of the taped conversations, we are not satisfied that these expenditures should be properly attributed to petitioner. Respondent has failed in his burden in this regard. (c) Capital Acquisitions, Inc.
Petitioner has stipulated that a total of $ 566,746 was contributed to Capital during 1978 as the corporation's initial capital. However, he contends that the contributions were not made by him and, as such, that they should not be included in respondent's analysis as expenditures. Respondent has the burden of proof on this issue and, based on the record, we hold that respondent has failed to carry his burden. Although there is no direct evidence to link Chagra with Capital, the peculiar and convoluted manner in which the corporation was incorporated, owned, operated and, later, liquidated makes us question *481 whether petitioner was involved in its ownership. Chagra's testimony concerning his involvement with the corporation was vague and unspecific, and we find the testimony lacking in credibility especially in light of the fact that he was the corporation's president. The purported owner of Resall, Inc. was the elusive Eduardo Reynosa. None of the principals, save Lee Chagra, admitted to ever having met Reynosa and, after the corporation was formed, his name was never mentioned again. Other condemning evidence concerns the manner in which the corporation was liquidated and its funds disbursed. Mrs. Chagra, as president of the corporation, executed contracts for the sale of the two houses owned by Capital. Following the receipt by the law firm handling the transactions of funds, the law firm disbursed the funds to Capital by check and instructed Mrs. Chagra that she may cash the checks as president. In that year, Mrs. Chagra executed notes to the corporation for the amount of the checks. However, the notes have never been satisfied nor has payment of the notes been demanded by any other principal of Capital. These actions may have been mere formalities intended to conceal the *482 true nature of the business arrangement. However, this approach ignores the possibility that others may have been involved with the corporation and, thus, made capital contributions to it. Specifically, it was Lee Chagra to whom the excess balance of a transfer from Capital to Joseph Chagra was returned following the payment of taxes for petitioner. It appears from the record that Lee Chagra played an intimate role in the formation of the corporation. He was also the only person who may have known "Eduardo Reynosa." In light of these additional facts, we cannot say that respondent proved that petitioner made the expenditures for capital contributions to Capital in the amount of $ 566,746. Since we conclude that respondent did not sustain his burden of showing that petitioners made the capital contributions to Capital, Capital's payment of taxes for Chagra in 1978 ($ 80,061 and $ 6,080 = $ 86,141) is likewise not properly attributable to petitioners. (d) Cash to Raul Royce
In his amendment to answer, respondent claims that petitioner gave $ 130,000 to Henry Wallace to deliver to Royce. The payment was for cocaine delivered to petitioner in 1977 in Colombia. We believe the *483 testimony of Wallace in this regard. Thus, we find that petitioner expended $ 130,000 in 1978. (e) 400 Pounds of Marijuana
In his amendment to answer, respondent claimed that Wallace delivered 400 pounds of marijuana to Joe Kinney. Respondent included this as an expenditure of petitioner valued at $ 60,000. We are not satisfied that this constitutes an expenditure by petitioner. Respondent failed to present sufficient evidence that the delivery of marijuana to a third party represents an expenditure by petitioner. (f) Cash to Barros and Mahias
Respondent also alleged in his amendment to answer that Chagra caused to be delivered to Omar Mahias and Jose Barros the sum of $ 50,000 each. The only evidence offered with respect to this expenditure was the testimony of Wallace at the Chagra drug trial. The testimony was vague with respect to the details surrounding these alleged payments. Therefore, it is insufficient to sustain the alleged expenditures. (g) Cash to Patsy de la Torres
Respondent raised in his amendment to answer an expenditure in the amount of $ 40,000 for cash given by Chagra to Patsy de la Torres, which was delivered by Wallace. In January 1978, *484 Wallace was working with or for petitioner and was importing marijuana between the Bahamas and Florida. At some point petitioner gave $ 140,000 to Wallace. Wallace took a Lear jet to El Paso. Pursuant to petitioner's instructions, Wallace gave $ 40,000 to Patsy de la Torres for petitioner's mother. This expenditure is properly included in respondent's expenditure of funds analysis. In his notice of deficiency, respondent determined an expenditure of $ 100,000 to Wallace. At petitioner's criminal trial, Wallace testified that the $ 100,000 remaining after he delivered $ 40,000 for petitioner's mother was his to keep. Wallace testified that he kept the $ 100,000. Petitioners have not presented any evidence to rebut this testimony. Consequently, we hold for respondent on this expenditure. (h) Three Kilograms to Wallace ($ 90,000); 3 Kilograms to Wallace ($ 10,000)
In his amendment to answer, respondent alleges these expenditures. Respondent abandons the $ 10,000 expenditure in his alternate computations and presented no evidence on the issue. A review of the record does not provide sufficient evidence of these transactions, nor how they might be expenditures of petitioner. *485 Therefore, they will not be treated as expenditures of petitioners. (i) Caesar's Palace - Currency Credit
In his amendment to answer, respondent charges petitioner with an additional expenditure for a currency credit at Ceasar's Palace in the amount of $ 480,000. During 1978, petitioner gambled excessively, winning and losing large sums of money. Respondent attempted to show that petitioner expended $ 480,000 by virtue of an alleged credit to petitioner's account at the Caesar's Palace. Respondent reached this conclusion based on the statements made by petitioner's purported representative to an IRS agent. We find that respondent did not meet his burden of establishing this expenditure of funds. The alleged representative admitted on cross-examination that he did not represent petitioner at the time of the meeting with the IRS agent. Additionally, the information provided was vague and insufficient to support a finding that petitioner expended $ 480,000. (j) Kerr Hit
During 1978, petitioner was aware of criminal proceedings against him. Petitioner approached Robert Piccolo about assassinating the Assistant United States Attorney, Jim Kerr. Piccolo contacted other *486 persons and ultimately delivered $ 75,000 paid by petitioner to hired killers. Petitioner later pleaded guilty to criminal violations relating to the attempted murder of Kerr. We sustain respondent's determination of this expenditure. (k) Cocaine to Young
Although this expenditure was raised by respondent in his amendment to answer and respondent bears the burden of proving it, there is no evidence in this record of an expenditure in this category. In his alternative computations, respondent does not include this item as an expenditure. Therefore, this item is not included as an expenditure for 1978. (l) Lear Jet Rental
Respondent relies on the transcript of testimony in the Chagra drug trial as a basis for finding that petitioner expended funds on two separate occasions for rental of Lear jets, $ 7,800 and $ 6,300. Respondent suggests that petitioner admitted the rental in his testimony. We do not agree. A review of the transcripts reflects that petitioner responded in the negative to questions relating to the rental of and purposes of rental of Lear jets in 1978. Respondent failed to present any other evidence in this regard. These amounts will not be treated *487 as expenditures of petitioners (m) Applicability of Maximum Tax Rate to 1978 Gambling Income
Petitioners argue that respondent erred in failing to apply the maximum marginal tax rate to the gambling income reported by petitioner on his 1978 return, as provided by section 1348.[8]Section 1.1348-3(a)(1)(i), Income Tax Regs., provides that "earned income" does not include "gambling gains." We have previously upheld this regulation. Kreider v. Commissioner, T.C. Memo 1984-68, affd. 762 F.2d 580 (7th Cir. 1985). The Supreme Court's decision in Commissioner v. Groetzinger, 480 U.S. 23, 94 L. Ed. 2d 25, 107 S. Ct. 980 (1987), does not change this result. In Commissioner v. Groetzinger, the Court defined "trade or business," as that term is used in sections 61(a) and 162(a), to include gambling in certain instances. However, the Court's interpretation of "trade or business" is confined only to those sections and does not construe the term as it appears in other sections of the Code. Commissioner v. Groetzinger, 480 U.S. at 27 n.8. Accordingly we hold that petitioners' gambling income for 1978 is not eligible for the 50 percent maximum *488 tax rate on earned income.
*489 5. 1979
For 1979, respondent used the specific item method to determine that petitioners understated their income by $ 2,000,000, which respondent attributed to Chagra's gambling activities. Petitioners challenge this determination as arbitrary and capricious because it was based solely on information contained in a newspaper article. Respondent's determinations in his notice of deficiency are presumed correct and the burden of proof, as well as the burden of going forward with the evidence, is placed upon the taxpayers. If, however, the taxpayer demonstrates that the statutory notice is arbitrarily excessive or without foundation, the burden of going forward with the evidence shifts to respondent. Helvering v. Taylor, 293 U.S. 507, 79 L. Ed. 623, 55 S. Ct. 287 (1935); Shriver v. Commissioner, 85 T.C. 1, 3 (1985), affd. without published opinion (7th Cir. Oct. 3, 1986). When a taxpayer asks us to find a statutory notice arbitrary, he is asking the Court to examine the evidence used by respondent in making his determination. Riland v. Commissioner, 79 T.C. 185, 201 (1982). We ordinarily will not look behind the notice of deficiency to examine *490 sufficiency of the evidence upon which respondent made his determination. Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984). The underlying rationale for this rule is that a trial before the Tax Court is a proceeding de novo; our determination as to petitioners' tax liability must be based on the merits of the case and not upon events preceding the trial of the case. Greenberg's Express, Inc., v. Commissioner, 62 T.C. 324, 327 (1974). We note at the outset that respondent may base his determination on hearsay evidence, even though the evidence is not admissible at trial. Rosano v. Commissioner, 46 T.C. 681, 687 (1966). However, his evidence must reveal some connection between the taxpayer and an income-producing activity. Mere supposition will not do. Jackson v. Commissioner, 73 T.C. 394 (1979). The evidence should connect the taxpayer with the activity for the entire period of alleged receipt of income. Gerardo v. Commissioner, 552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Decision of this Court. Since the information relating to a taxpayer's *491 finances is within the control of the taxpayer, it is up to him to disprove respondent's determination. But, this presumption of correctness does not attach if respondent's determination lacks a reasonable basis. Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part and revg. in part 74 T.C. 260 (1980). For the following reasons, we find that respondent's reliance upon a newspaper article, without further investigation, as the sole basis for his determination was unreasonable and, thus, not entitled to the customary presumption of correctness. In Jackson v. Commissioner, 73 T.C. 394 (1979), we considered whether information provided by an informant to an officer of the DEA was a sufficient basis to support a deficiency in the taxpayer's Federal income taxes as determined by respondent. The taxpayer's testimony that he did not earn money through the sale of narcotics was found to be self-serving and lacking in credibility. Nevertheless, we reviewed the evidence upon which respondent's determination was based and concluded that no facts tied the taxpayer to any narcotics operation during the year in question. *492 Thus, we held that the determination was arbitrary and capricious, which shifted the burden of going forward with the evidence to respondent to establish the existence and amount of any deficiency. Since other evidence supporting the determination was lacking, we ruled for the taxpayer. In Llorente v. Commissioner, 649 F.2d at 156, the Court of Appeals held that the Commissioner's determination of a deficiency was arbitrary and capricious. The Court discussed the attachment of the presumption of correctness to a determination made by the Commissioner: that presumption is only as strong as its rational underpinnings. Where it lacks a rational basis the presumption evaporates. Otherwise the Commissioner could, merely by arbitrarily issuing a naked assessment, place upon the taxpayer the unfair, and at time impossible, burden of proving a negative, that he did not receive the illegal income assessed against him.
The sole information upon which the deficiency was based in that case was that the taxpayer was heard to say that a particular shipment of cocaine had not arrived. The party who claimed to have overheard the statement did not testify on behalf *493 of the Commissioner. The Court of Appeals for the Second Circuit ruled that the Commissioner's determination that the taxpayer expended funds for the purchase of cocaine lacked a rational foundation and was thus arbitrary. In this case, the revenue agent testified that he did not further investigate whether Chagra in fact won nearly $ 2 million at the Horseshoe Casino. He did not testify that he subsequently reviewed the transcript of Binion's testimony. Neither did the agent contact either of petitioners during his audit of years 1977 through 1981. He did, however, perform a source and expenditure of funds method analysis for 1979. With respect to this analysis, the agent testified: Q: You performed the examination for 1979 on the specific item or items of income method. Is that right? A: That is correct. Q: And that was a different method than you used for the other years. A: That is correct. Q: Why? A: The article that appeared in the newspaper reflected 2 million dollars in gambling winnings, and in my judgment, being a specific income item -- at times it is a lot easier, based on the best available financial information. Q: Did you perform a source *494 and application of funds analysis for that year? A: I did. Q: Which analysis resulted in greater taxable income or greater adjustment? A: Specific income item. Q: The method that you used? A: That is correct. Q: Why did you use it? A: Judgment. Q: Speak up. A: It was a judgment decision. Q: Did you use it to protect the Government's interests? A: I did.
The agent did not testify as to the results of the expenditure analysis, but any difference between the numbers should have at least moved the agent to make basic inquiry regarding the gambling income which petitioner purportedly won during 1979. Respondent's determination must be reasonable before a presumption of correctness will attach to it. We do not think that reliance upon a newspaper article without further investigation was reasonable, even considering the fact that the article concerned Chagra's drug trial. The article reported a third party's statement that Chagra won $ 2,000,000 over an 8 month period of time. Respondent's agents could have performed a minimal investigation by inquiring at the Horseshoe Casino and other casinos known to be frequented by Chagra. Respondent performed *495 a source and expenditure of funds analysis for 1979, and chose not to base his determination on those computations since they resulted in a deficiency in some lesser amount. We cannot see how a newspaper article, which only incidentally mentioned income, is a reasonable basis for a determination absent further inquiry and investigation. Given that the revenue agent did nothing to substantiate a general statement made by Binion at a prior trial and reported in a newspaper, respondent's determination that petitioners had unreported income in the amount of $ 2,000,000 for 1979 is arbitrary and capricious. Since the burden of going forward with the evidence is shifted to respondent to establish the existence and amount of any deficiency for 1979, we look to the evidence which he presented with regard to that year. Respondent presented the testimony of Jack Binion, the declarant in the newspaper article which served as the basis for his determination of deficiency. Binion testified that the amount was closer to $ 1.9 million. With the exception of about $ 400,000 which he saw Chagra win, Binion's information was not drawn from personal observance of Chagra's gambling efforts. He *496 testified that he kept a running total in his head for over a period of 8 months, drawn from information provided piecemeal by pit bosses. He acknowledged that Chagra lost large amounts of money in gambling, and testified that he did not keep track of the losses. Actually, he testified that Chagra might have lost more money than he won at the Horseshoe Casino. While we do not doubt the sincerity of this witness, we find his testimony so vague as to lack any probative value with respect to the item at issue. Binion did not see Chagra win at his casino, with the exception of approximately $ 400,000, and he did not keep track of Chagra's losses. He testified that Chagra did not gamble at any other casinos in Las Vegas during 1979, a fact which we do not find him qualified to state. Chagra testified that he gambled incessantly during 1979, a statement which could reasonably suggest gambling at other establishments. Further, for a small part of 1979, petitioners resided at Caesar's Palace. That Chagra lived in a casino hotel but did not gamble there is inconsistent with the record in this case. Respondent did not furnish any additional corroboration for the deficiency, other than *497 the testimony of Binion. We therefore conclude that respondent did not satisfy his burden of going forward with the evidence to establish the existence and amount of any deficiency for 1979 based on unreported income. Accordingly, we hold for petitioners on this issue. As an aside, we note that given additional evidence of income from other sources, we could nevertheless sustain respondent's determination of income based on other sources. However, this is not the case here. The only evidence of unreported income for 1979 derived from sources other than gambling was Chagra's statement concerning his departure from the drug importation business. At trial, he stated: Q: Is there any reason why in your interrogatories you said that you might have engaged in narcotics trafficking in 1979? A: Yes Sir. When I left Florida, I turned over the business as such to Mr. Piccolo, Bill Painer, Bruce, all the employees that had worked for me over the years. And I told them that I wanted one last profit on the next load as -- giving them the business. In other words, I wanted to make 20, $ 25 a pound on the next load they got in. And I think that happened -- I think they did that *498 load after '79, and that is why I said that, Mr. Pillar.
Respondent did not follow up on this line of questioning to determine whether Chagra did receive his requested share of the profits from the shipment and, if he did, the amount he received. Even though Chagra testified generally as to the profit he wanted to make on the shipment, he did not testify that he received that amount. [9] Thus, his testimony is not sufficient to support a deficiency determination. Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. in part 67 T.C. 672 (1977). Additionally, certain expenditures incurred in renovating petitioners' Las Vegas residence were made during 1979. The parties stipulated to other expenditures for 1979, as well. However, respondent elected not to use his source and expenditure of funds analysis to support the deficiency determination for 1979, and he cannot now expect the Court to ignore his election. Prizep v. Commissioner, T.C. Memo 1959-56. As for 1979, we hold that petitioners did not underreport their income by $ 2,000,000 as determined by respondent. [10]
*499 Petitioners challenge respondent's disallowance of a deduction for cost of goods sold claimed by petitioners on their 1979 return. On this point, we sustain respondent's determination. Although petitioners are essentially correct in their argument that they are entitled to reduce income from an illicit activity by the cost of goods sold, they did not present sufficient evidence to substantiate the amount which they claimed. Further, their evidence did not establish a nexus between the cost and the income which they received (reported) during that year from the sale of goods. [11] Chagra testified repeatedly that he arrived at the amount of his income during the year by subtracting his expenditures from income as he went along. This leads us to believe that he possibly already took those expenses, whatever they were, into account. For these reasons, petitioners are not entitled to the $ 70,000 deduction claimed for cost of goods sold during 1979. *500 6. 1980
Petitioners stipulated to all but one of the expenditures which respondent determined for 1980. However, they contend that respondent must establish a source of income to support the expenditures, which he failed to do with respect to years 1980 and 1981. They cite Dupree v. United States, 218 F.2d 781 (5th Cir. 1955), in support of their contention. Petitioners' argument is misplaced. Although the court in Dupree imposed upon the Government a burden to establish a source of income when using the source and expenditures method, that case refers to the allocation of burdens in a criminal matter. Here, we are faced with a civil tax deficiency coupled with fraud. Petitioners cannot admit to expenditures and then attempt to avoid the consequences by arguing burden of proof. Parks v. Commissioner, 94 T.C. 654, 658 (1990). Moreover, we note that respondent in his income computations offset expenditures by numerous sources of funds, including substantial amounts of nontaxable income. The record in this case does not justify further offsets. As petitioners themselves point out, the evidence presented at trial and the stipulations *501 of fact establish that petitioners expended more than a million dollars during 1980 and 1981 despite the fact that Chagra was incarcerated for most of 1980 and all of 1981 and Mrs. Chagra generated no income during those years. We thus sustain respondent's use of the source and expenditure of funds method for 1980 and 1981. Turning now to the substance of the expenditures for 1980, most of the expenditures outlined in respondent's alternative computation were stipulated by petitioners. Petitioners were credited with $ 148,303 in sources of funds. Respondent determined that petitioners spent $ 1,032,476 (per his alternative computation). Of this amount, an expenditure of $ 50,000 alleged to have been paid to Oscar Goodman by Chagra is at issue. Additionally, petitioners do not stipulate that a total of $ 150,865 was expended from the Joseph S. Chagra Trust Account on behalf of Mrs. Chagra, although they do stipulate that expenditures were made from this account for her benefit. Respondent is sustained with respect to all other expenditures due to petitioner's concessions. a. Expenditures from Joseph S. Chagra Trust Account
Petitioners stipulate that the Joseph S. Chagra *502 Trust Account was used to pay bills for or on behalf of Mrs. Chagra during 1980. In his notice of deficiency, respondent determined that a total of $ 150,865 was expended from the account on her behalf. As to 1980, petitioners have the burden to disprove determinations made by respondent in his notice of deficiency. Although the evidence presented at trial identified only a few expenditures made from this account, in the absence of evidence from petitioners that the $ 150,865 figure is erroneous or is duplicative of other expenditures, [12] respondent's determination of an expenditure in the amount of $ 150,865 is sustained. b. Transfer of $ 50,000 to Oscar Goodman
Petitioners challenge respondent's *503 determination that Chagra did transfer $ 50,000 to Oscar Goodman during 1980. Respondent raised this expenditure in his amendment to answer and it is his burden to prove the expenditure. Evidence concerning this expenditure is confusing. From the record, it appears that Joseph Chagra borrowed $ 50,000 from Oscar Goodman on October 30, 1980. Respondent maintains that Joseph Chagra did not pay off this obligation; however, Oscar Goodman testified at the proceedings that $ 46,000 of the loan was paid off and that he was satisfied that the obligation was met. We cannot see how this transaction translates into an expenditure by petitioner unless we assume that the money which Joseph Chagra borrowed from Goodman originated from petitioner. We cannot make this connection based on the available facts, and hold for petitioners with respect to this expenditure. Based on the foregoing, petitioners spent a total amount of $ 982,476 during 1980, which exceeds their total sources of funds for that year by $ 834,173. We hold that petitioners understated their taxable income for 1980 by $ 834,173. 7. 1981
Respondent has established that petitioners spent $ 42,736 more than their reported *504 income in 1981. Petitioners stipulated to these expenditures. In absence of any rebuttal evidence presented by petitioners that the expenditures as determined are erroneous or should be attributed to nontaxable sources, we conclude that petitioners understated their income by $ 42,736 in 1981. 8. General Matters
a. Attorney's Fees as Deductions
Deductions are a matter of legislative grace. Petitioners have the burden of establishing that they are entitled to the deductions claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 78 L. Ed. 1348, 54 S. Ct. 788 (1934); Rule 142(a). Petitioners claimed the following deductions for attorney's fees and expenses in the indicated years: YEAR
TO WHOM PAID
AMOUNT 1978
Lee Chagra
$ 122,500
Joseph Oteri
100,000
1979
Michael Singer
6,800
Oscar Goodman
118,000
Joseph Chagra
151,000
Trial Expenses
66,544
1980
Oscar Goodman
25,000
Joseph Chagra
75,000
Trial Expenses
6,054
1981
Oscar Goodman
35,000
These deductions were disallowed by respondent; however, respondent concedes that the 1979 payment to Michael Singer, a tax return preparer, is deductible to petitioners under section 212(3). We are *505 unable to sustain petitioners' deductions for attorney's fees paid to Joseph Chagra, petitioner's brother. Although there was testimony as to the services performed by Joseph Chagra in exchange for his fees of $ 151,000 (1979) and $ 75,000 (1980), this testimony was not uncontroverted nor free from question. No records documenting the billing or services rendered were introduced at trial. The close family relationship between the two brothers resulted in many transfers of funds. In light of the numerous transfers of funds and petitioners' frequent use of Joseph Chagra's business trust account to shield funds from detection, we cannot conclude that these amounts were transferred to Joseph Chagra solely in exchange for legal services rendered. With respect to attorney's fees paid by Chagra to his other lawyers, including Lee Chagra, Oscar Goodman and Joe Oteri, we hold that petitioners did not establish that the payments were ordinary and necessary expenditures paid in carrying on a trade or business. Sec. 162(a). [13] Although we are aware that Oteri and Goodman in fact represented petitioner before various courts with respect to his indictments on drug trafficking charges, petitioner *506 has not established that the amounts which were paid were reasonable in light of the services rendered. No records accounting for services performed were presented at trial, and testimony relating to the payments was, at best, vague. It is clear that attorneys Goodman and Oteri performed some amount of legal services for petitioner with respect to his indictments and prosecutions for drug smuggling. Nevertheless, proof of the services performed and a nexus between those services and the amounts paid continues to be lacking. Under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), affg. in part and revg. in part 11 B.T.A. 743 (1928), we are authorized to allow a deduction where the taxpayer has established entitlement to, but not the precise amount *507 of, a deduction. That rationale is not applicable to petitioners' case since the record herein is devoid of any rational basis by which we could allocate any amount that is directly related to petitioner's trade or business, or is otherwise deductible. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985); Epp v. Commissioner, 78 T.C. 801, 807; CORE Special Purpose Fund v. Commissioner, T.C. Memo 1985-48. Respondent's disallowance of claimed deductions for attorney's fees paid to Goldman and Oteri is sustained in full. b. Addition to Tax for Fraud
The final issue presented for decision is whether petitioners are liable for additions to tax for fraud under section 6653(b) as determined in the notice of deficiency. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111 (1983). *508 To sustain respondent's determinations with respect to fraud, we must find that he has established by clear and convincing evidence: (1) An underpayment of tax, and (2) that a portion of the underpayment was due to fraud. Rule 142(b); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). During the years at issue, the addition to tax for fraud attaches to the entire deficiency where it is shown that at least some part of the underpayment is attributable to fraud. The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may be examined to establish the requisite intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). The intent to conceal or *509 mislead may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954). Other badges of fraud include: Failing to maintain adequate books and records; failing to file income tax returns; giving implausible or inconsistent explanations of behavior; concealing assets; failing to cooperate with tax authorities; engaging in illegal activities; dealing in cash; and failing to make estimated tax payments. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. As to petitioners' taxable years 1977 and 1978, we are satisfied that the evidence adduced by respondent establishes clearly and convincingly that petitioners are liable for the additions to tax for fraud. [14] Respondent proved an underpayment of tax for each of 1977 and 1978. For those years, petitioners filed false returns. Both petitioners were aware of income from their *510 illegal drug trafficking yet failed to report it on their joint return. They dealt in large amounts of cash and failed to maintain any books or records. They concealed assets by using family members and by purchasing goods under assumed names. They provided their tax return preparers with incomplete information with which to prepare their returns. We thus sustain respondent's determination of the additions to tax for fraud for the years 1977 and 1978. As to 1979, any underpayment of tax resulted from the disallowance of certain claimed deductions, which we sustained. Respondent has failed to show that any portion of that underpayment was due to fraud. Accordingly, we hold for petitioners that they are not liable for the addition *511 to tax for fraud, computed under section 6653(b), for taxable year 1979. As to 1980, petitioners underreported their taxable income. Several "badges of fraud" are present for that year, including frequent use of cash, concealment of assets, and failure to maintain books and records. Additionally, petitioners have stipulated many transactions in 1980 which give support to respondent's determination of fraud. For these reasons, we sustain respondent's determination that petitioners are liable for the addition to tax for fraud under section 6653(b) for 1980. With respect to 1981, we upheld respondent's deficiency determination for that year. Petitioner was incarcerated beginning in February 1980 and continuously through 1981. Although Mrs. Chagra made some cash expenditures during 1981, petitioners timely filed their Federal income tax return for 1981. Respondent failed to carry his burden of establishing that the underpayment of tax for 1981 is due to fraud. Accordingly, we do not sustain respondent's determination of an addition to tax for fraud for 1981. To reflect our resolution of the disputed issues and the concessions of the parties, Decision will be entered under *512 Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. There are additional procedural and evidentiary issues which will be discussed within the context of the issues enumerated herein.↩
*. In his reply brief, respondent asserts an alternative computation which totals $ 839,575. Respondent arrives at this computation as follows: Jewelry (reduced)
$ 64,575
Capital Acquisitions (reduced)
$ -0-   Betty Wallace (new item)
$ 10,000
** Due to the concessions, respondent asserts that the understatement of income for 1977 is $ 749,575 ($ 839,575 less $ 90,000).↩
*. These items were removed from respondent's computation because the expenditure is included in the "Personal Disbursements from #127-046-0" amount, above.↩
*. These amounts represent the proceeds from the disposition of Capital Acquisitions, Inc.'s properties.↩
3. It is claimed that petitioners were "common-law spouses" from April 1974 to January 1978. Petitioners resided in Texas for most of 1977 and it is far from clear the point at which they "moved" to Florida for purposes of residency. Texas recognizes "marriages without formalities," while Florida has abolished common law marriages by statute. See Tex. Family Code Ann. (Vernon 1975) sec. 1.91 (1975); Fla. Stat. sec. 741.211 (1989). For purposes of the Federal tax laws, taxpayers are considered married if their marriage is recognized under the laws of the State in which the marriage relationship was entered. Von Tersch v. Commissioner, 47 T.C. 415, 419 (1967). If petitioners were considered married under Texas law, their move to Florida (which does not recognize common-law marriages) before the end of the taxable year would not affect their status for application of the tax laws. See Ross v. Commissioner, T.C. Memo 1972-122; Amaro v. Commissioner, T.C. Memo 1970-208. The record in this case does not establish that petitioners were considered married under Texas law during 1977. Texas Family Code sec. 1.91↩ requires that there be an agreement between the parties to be husband and wife, and to reside as such. The statute further requires the parties to execute a "declaration of marriage" in a form prescribed by statute, which is to be made part of the public record. Tex. Family Code Ann. (Vernon 1975) secs. 1.92, 1.94. The parties were formally engaged sometime during 1975, and were married by ceremony in 1978. These actions may indicate that the intent to be husband and wife required by the Texas statute was absent in 1977. Whatever the case, it has not been shown that the parties executed and caused to be filed the necessary declaration of marriage. For these reasons, we consider the parties to have been single during 1977. Thus, Mrs. Chagra did not have income during 1977 as a result of any community property share of Chagra's income during that year.
4. In some applications, the term "cash expenditures method" has been used interchangeably with "source and application of funds method." See, e.g., DeVenney v. Commissioner, 85 T.C. 927, 930-931↩ (1985). In the present case, respondent reduced expenditures by all known nontaxable sources of income (such as loan proceeds) to avoid double inclusion of income. This is consistent with his prior usage of the method, and with the theory underlying reconstruction of income generally.
5. None of the tax payments resulting from the sale of petitioners' seized property were treated as expenditures of funds in this case.↩
6. Even if we had found that the witness was not an expert, we would nonetheless disregard his testimony on other grounds. As a non-expert, the witness did not establish a reliable predicate on which his testimony was based. His opinion testimony does not come within the scope of Rule 701, Federal Rules of Evidence, which permits a lay witness to offer opinion testimony under limited circumstances. Opinion testimony is permissible from a lay witness only when the opinion is (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Since the witness' testimony was the opinion itself, it can hardly be said that the opinion accentuates other testimony. Although the witness was called to testify only as to his "knowledge," his knowledge was of facts not directly relevant to the case at issue. Rule 701↩ was not intended to cover these situations.
7. Rule 143(f) was subsequently amended to require submitting the expert witness report to the Court, and furnishing a copy to each other party, no later than 30 days before the call of the calendar.↩
*. The stipulated amount is "$ 61,080." However, a review of the primary documents shows this to be a misprint and that the correct amount of taxes paid for tax year 1976 was $ 6,080.↩
8. Sec. 1348 was repealed for tax years beginning after Dec. 31, 1981, by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 101(c)(1) 95 Stat. 178. During the year at issue, sec. 1348 read as follows: SEC. 1348. 50-PERCENT MAXIMUM RATE ON PERSONAL SERVICE INCOME. (a) General Rule. -- If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of -- (1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent, (2) 50 percent of the amount by which his personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income. (b) Definitions. -- For purposes of this section -- (1) Personal service income. (A) In general. The term 'personal service income' means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) or which is an amount received as a pension or annuity which arises from an employer-employee relationship or from tax-deductible contributions to a retirement plan. For purposes of this subparagraph, section 911(b) shall be applied without regard to the phrase "not in excess of 30 percent of his share of net profits of such trade or business." (B) Exceptions. The term "personal service income" does not include any amount -- (i) to which section 72(m)(5), 402(a)(2), 402(e), 403(a)(2), 408(e)(2), 408(e)(3), 408(e)(4), 408(e)(5), 408(f), or 409(c) applies; or (ii) which is includible in gross income under section 409(b) because of the redemption of a bond which was not tendered before the close of the taxable year in which the registered owner attained age 70 1/2.
(2) Personal service taxable income. The personal service taxable income of an individual is the excess of -- (A) the amount which bears the same ratio (but not in excess of 100 percent) to his taxable income as his personal service net income bears to his adjusted gross income, over (B) the sum of the items of tax preference described in subsection (a) (other than paragraph (9)) of section 57 for the taxable year.
For purposes of subparagraph (A), the term 'personal service net income' means personal service income reduced by any deductions allowable under section 62 which are properly allocable to or chargeable against such personal service income.
(c) Married individuals. -- This section shall apply to a married individual only if such individual and his spouse make a single return jointly for the taxable year.↩
9. On his 1979 return, petitioner reported $ 30,000 income from gross receipts or sales. ↩
10. On other issues, we sustain respondent's disallowance of certain deductions claimed by petitioners on their 1979 return. Since deductions offsetting all of petitioners' reported income have been disallowed, there nevertheless was a deficiency of tax for 1979, despite our resolution of this question in favor of petitioners.↩
11. We note that petitioners reported only $ 30,000 income derived from gross receipts or sales (which, given petitioners' argument, we will assume represents income from his drug trafficking operation). If the cost of the "goods" was $ 70,000, then petitioner lost↩ money on his dealings in 1979. This is inconsistent with petitioner's own testimony concerning the write-up of narcotics and the profits generally made by dealers.
12. In this regard, we note that respondent appears to have been aware of the potential for double-inclusion of expenditures. Accordingly, he eliminated from his amendment to answer a claim of expenditure for the home on Santa Anita Street in El Paso ($ 95,000), which was funded from the Joseph S. Chagra Trust Account.↩
13. We note the addition to sec. 280E, which prevents the deduction of expenses relating to illegal drug trafficking incurred after September 3, 1982. This section is not applicable to transactions during the years in question here.↩
14. Since we have found that there is no deficiency due from Mrs. Chagra for 1977, there would be no addition to tax for fraud with respect to her for that year. Accordingly any references to deficiencies or additions to tax for fraud for 1977 are intended to refer to petitioner only.↩